## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|   |   |   |
|---|---|---|
| **UNITED STATES OF AMERICA** | \| | |
| | \| | **Criminal Case No.:  02-388 (2) (ESH)** |
| **v.** | \| | |
| | \| | **-- Filed Under Seal --** |
| **SALVATORE MANCUSO GOMEZ** | \| | |
| | \| | |

## MEMORANDUM IN AID OF SENTENCING
## MADE PURSUANT TO 18 U.S.C. § 3553 (a) FACTORS

COMES NOW DEFENDANT, Salvatore Mancuso Gomez ("hereinafter referred to as "Mr. Mancuso"), by and through the undersigned attorney, and respectfully submits this *Memorandum in Aid of Sentencing* addressing the factors set forth under 18 U.S.C. § 3553 (a).

### Summary of Argument

Mr. Mancuso respectfully requests that the Court vary downward in light of his acceptance of responsibility and extraordinary cooperation.  Additional support for such a variance is found in other factors fully set forth in this memorandum, and include:  Mr. Mancuso's history and character; the danger of cooperation, to him and his family; the adverse conditions of his confinement; and, extraordinary familial circumstances.

Mr. Mancuso respectfully submits that the Court should begin analysis of his guideline level, and subsequent reductions made pursuant to § 3553 (a), by analyzing whether the low-end, or high-end of the agreed upon offense range should be the starting point for analysis: specifically, whether analysis should start at the low-end of Guideline Level 41, at 324-months rather than the 405-months requested by the government.  See Government Sentence Memorandum, ECF 123, p.22.  Mr. Mancuso then argues that once the appropriate guideline

range is determined, the Court should vary from the sentencing guideline based upon an analysis under 18 U.S.C. § 3553 (a) factors.

Mr. Mancuso shall file concurrently with this memorandum a companion sentence memorandum addressing the government's motion for sentence reduction made pursuant to U.S.S.G. §5K1.1.

## 18 U.S.C. § 3553 (a) (1) - Character of Mr. Mancuso
## In Acceptance of Responsibility & Cooperation

Mr. Mancuso warrants mitigation pursuant to 18 U.S.C. § 3553 (a) (1), as set forth and agreed upon in the terms of his plea agreement. The Court should recognize the history and characteristics of the Mr. Mancuso, including, the substantial assistance he provided and continues to provide today.

Commencing in 2002, Mr. Mancuso led efforts to demobilize the "Autodefensas Unidas de Colombia" (hereinafter referred to as the "AUC"), and  convinced leaders of the organization to surrender to Colombian authorities and begin cooperating with the Colombian government and judicial authorities. He could have chosen to preserve his influence and control, but instead, Mr. Mancuso channeled his efforts to seek peace and engaged other AUC commanders to participate and bring peace and stability to an otherwise troubled region.

Unlike most defendants that appear before this Court after being arrested, Mr. Mancuso voluntarily surrendered to Colombian authorities on July 1, 2004. He immediately became part of efforts to demobilize, disarm and reach an agreement between the AUC and the central government that culminated with the enactment of the "Justice and Peace Law." What is more significant during this period of 2004 to 2008, is that from the time Mr. Mancuso demobilized, until the present, he abstained from further criminal activity. None other than Mario Iguaran, the Attorney General of Colombia, specifically assured Unites States authorities that there was no

evidence that Mr. Mancuso had engaged in any further activity and that he was an essential promoter of peace in Colombia.[1] This course of conduct was further supported by Colombia's official recognition that Mr. Mancuso had complied with all requirements, including, being truthful and making reparations to the victims of the conflict.

Although he finds himself in the United States today, Mr. Mancuso continues to participate in the Justice & Peace process. Furthermore, he continues to cooperate with the Colombian judiciary and other governmental entities. Mr. Mancuso has played a significant role in criminal investigations carried out by the Colombian Supreme Court, by prosecutors and courts in Justice & Peace, and various special investigations by the Colombian "Fiscalia General."

Although today, government prosecutors questions his motivation for participating in the Justice & Peace process,[2] it is clear that his actions following his arrival in the United States completely undermine such insinuation. Upon his arrival in the United States on May 13, 2008, Mr. Mancuso could have opted to withdraw from further cooperation with Colombia. Such a decision would have undermined the credibility of that country's judicial institutions and would have made it difficult to prosecute law violators; this, in light of the fact that the United States had spent considerable financial and political resources improving accountability, strengthening

---

[1] The government noted in Footnote 20, page 14 of its Sentencing Memorandum, that "President Alvaro Uribe stated publicly that he extradited the AUC leaders because he believed they had failed at the time to comply with all aspects of the Justice and Peace law." Although this statement may have been true as to some of the other paramilitary leaders that were extradited, it was certainly not the case for Mr. Mancuso. Thus, the government seems to have glossed over the fact that even members of President Uribe's own administration had acknowledged that there was no evidence that Mr. Mancuso had committed any crimes following his entry into Justice & Peace.

[2] The government submits that "[i]t is unclear what Mancuso's motivations were for participating in the Justice and Peace process. It could be that he was motivated, in part by a desire to bring about some reconciliation and unity after the surrender and partial demobilization of the AUC [fn 24]. However, it could be equally true that he was motivated by a desire to limit his extensive sentencing exposure for the hundreds of violent crimes with which he was charged in Colombia." Government's Memorandum in Aid of Sentencing and Motion Pursuant to U.S.S.G. §5K1.1.

the rule of law and combating impunity in Colombia.  Mr. Mancuso's withdrawal from Justice &

Peace would have effectively deprived the Colombian courts and prosecutors from achieving

such objectives.

Mr. Mancuso's decision to cooperate had great impact.  Former Colombian President

Alvaro Uribe's decision to extradite Mr. Mancuso was widely questioned; with many suggesting

that it was motivated by a desire to undermine the prosecution of several politicians that were

being investigated by the Supreme Court of Colombia.[3]  ████████████████████

████████████████████████████████  Mr. Mancuso was an essential witness in the

investigation and his extradition compromised the process.  In response, the Supreme

Court of Colombia scheduled a hearing for ████████████████  to receive Mr. Mancuso's

testimony from the United States.

Despite the absence of a U.S. plea agreement and knowing that by testifying he could

expose his family to retribution and risk of harm, Mr. Mancuso decided to testify via

teleconference in a proceeding that was covered nationwide on Colombian television.  At that

time, Mancuso made the following statement:

> "I made an agreement to change my life when I demobilized in 2004.  I have
> followed the right path since then. I am not trying to use my testimony to receive a
> more favorable agreement as my commitment is to tell the truth, collaborate with
> the justice system in order to obtain peace and reconciliation in my country."

---

[3] In 2004, the Colombian government enacted measures to assure that Mr. Mancuso would not be extradited, provided, he continued his cooperation and efforts towards peace.  See Executive Order 303, December 16, 2004. Yet , two-years later, President Uribe extradited Mr. Mancuso alleging that he had failed to comply with efforts to cooperate with the government.  Subsequent, thereto, in response to a judicial inquiry addressed to President Uribe, he had to admit that there was no evidence of non-compliance but that the extradition was discretionary. See Exhibit 13 (Carta Enviada por el Sr. Mancuso y respuesta del presidente de Colombia Álvaro Uribe [President Uribe's Response to Judicial Inquiry Made by Salvatore Mancuso]).  This sequence of events underscores the risk inherent in providing full cooperation to Colombian law enforcement institutions.   Mr. Mancuso's extradition, and the reason later provided by the Colombian president, demonstrate the risk faced by Mr. Mancuso as a direct result of his cooperation with Colombian and United States law enforcement and prosecutors.



Mr. Mancuso's cooperation with the United States authorities, beginning a week after his arrival in the United States, has been significant and useful, exceeding the expectations of the prosecutors and agents assigned to the case. Beyond Colombia and the United States, Mr. Mancuso also provided substantial assistance to law enforcement and prosecutors from Italy. Although details of Mr. Mancuso's cooperation will be discussed in the supplemental §5K1.1 filing, such actions demonstrate his extraordinary acceptance of responsibility, his cooperation, and his willingness to break from any past criminal associates and activities. 18 U.S.C. § 3553 (a) (1). See *United States v. Massey*, 663 F.3d 852 (6th Cir. 2011) ("although departures under §5K1.1 require a motion from the government, variances do not;" district court retains discretion to take the defendant's cooperation into account as a section 3553(a) mitigating factor).

### History and Characteristics of Mr. Mancuso - § 3553 (a) (1)

Mr. Mancuso's life and upbringing are intrinsically connected to Colombia's turbulent history. It is an experience that links the past with the present and the recent past with the more distant past. Colombia suffers from more than 60-years of an "irregular war," fueled by various causes of ideological, political and social origin. This history provides a backdrop for significant

events in Mr. Mancuso's life and, therefore proves important in understanding the nature and circumstances of the offense and his personal history and characteristics.  18 U.S.C. § 3553 (a) (1).

During the 1990's, Colombia was on the verge of becoming a failed state.   Several illegally armed groups financed through drug trafficking, including the Revolutionary Armed Forces of Colombia (FARC), were terrorizing citizens everywhere.  The FARC was a leftist guerrilla organization born in the 1960's that had grown in number to more than 20,000 combatants.   Fueled by drug money, the FARC exerted control over rural regions of Colombia. As the FARC's economic and military power grew, the government retreated to urban enclaves in Bogota, Medellin and Cali.  The countryside was left in the hands of the guerrillas who extorted all segments of society, but particularly, cattlemen and farmers against whom "war-taxes" that were levied as a condition of their survival.

 The "war-tax" fueled the FARC guerrilla effort, bouyed the communist party and liberal movement.  From their inception, the FARC publicly announced class warfare, armed and violent rebellion and organization of the masses to seize power.  They pitted the population against itself for simply belonging to different classes, or thinking differently and adversely to the totalitarian regime

What otherwise would have been the tranquil existence of a cattle rancher, was marred and shaped by external factors impacting his surroundings.  Mr. Mancuso was unwilling to be extorted by the guerrillas.  Rather than submitting to it, he joined an organization supported by members of the Colombian army and political establishment who were recruiting individuals willing to fight the FARC.  The AUC" became a governmentally sponsored alternative to the FARC.  The growth of the AUC in such a short time was the direct result of the support of a

large segment of the population and the rejection of the FARC's terrorist activities.  To a degree,

Colombia's political and business institutions used the AUC as a front to eradicate the guerrilla

activity.

   As the FARC guerrillas were subjecting the Colombian countryside to general and

indiscriminant acts of aggression, assassinations, kidnappings and extortion, Mr. Mancuso,

along with his neighbors, became targets.  Due to this, Mr. Mancuso sought protection from the

government.  See Exhibit 1 (Carta, Colombian Minister of Defense, Requesting Protection,

1995).  In fact, it was the national Colombian government that created the so called "civil

defense" organizations, which were in essence armed civilian groups sanctioned by the

government:

> The rationale for this decree is to promote natiaonal security through
> civil participation in national defense.   The executive branch is
> authorized to form national defense groups which shall be armed
> with weapons which are othewise solely within the control of the
> armed forces.  Colombian Law 48, 1968 See Exhibit 2 (Case 82611)

As a result of this law, sanctioned by the government, civil defense groups were created

throughout the nation to meet the security needs of the people.  To fight guerilla aggression, Mr.

Mancuso joined and eventually led one of these "civil defense" blocks.  Members of the regular

Colombian army trained and provided logistical support to these self-defense groups, including

the one that Mr. Mancuso had joined.

   The government attempts to portray Mr. Mancuso as having direct control over several

"bloque" commanders of the AUC.[4]  This attempt to aggrandize his responsibility is undermined

by Colombian reports that indicate that each bloque was independent and commanded by

---

[4] The government argues in their memorandum that "[t]he bloque commanders—which included Rodrigo Tovar-Pupo (alias "Jorge 40"), Hernan Giraldo-Serna, Carlos Jimenez-Naranjo (alias "Macaco"), Ramiro Vanoy-Murillo (alias "Cuco"), and Miguel Mejia-Munera—reported directly to the defendant. *Government's Memorandum of Relevant Cases*, at page 2.  Yet, the facts clearly show that each commander merely controlled their "bloque."

different individuals who operated autonomously; ████████████████████████

████████████████████████████████████████████████████

██████████████████████[8] Each had independent control over their political,

financial and drug trafficking activities, including, the collection of drug taxes.  Only as part of

the process of negotiations with the government, did Mr. Mancuso play a significant role in

terms of representing the different AUC commanders.  Those efforts were part of Mr. Mancuso's

attempt to lead the negotiations that ultimately culminated in the demobilization of the different

commanders and brought peace to Colombia.

Between, 1997-2004, until Mr. Mancuso's voluntary demobilization, the three

paramilitary bloques commanded by Mr. Mancuso, seized cocaine cultivation, production, tax

and distribution from FARC guerrillas.  After petitioning the central government, in August of

1997, for eradication of the drug cultivation, and being ignored (See Exhibit 3), Mr. Mancuso's

superiors, Vicente and Carlos Castaño, ordered him to use the drug trade to finance paramilitary

operations.  See Government Sentence Memorandum, ECF 123, p.2.  By 2002, at the height

of paramilitary influence in Colombia, the US classified the AUC as a narco-terrorist

organization and Mr. Mancuso was indicted in the present case.[9]

As recognized by the government in its sentencing memorandum, "[b]y the time Mr.

Mancuso was extradited to the United States in May 2008, a large part of the AUC had

surrendered…."  Government's Sentencing Memorandum, Pg. 14.  However, the government

---

████████████████████████████████████████████████████
████████████████████████

[9] On July 1, 2014, Secretary of State John F. Kerry revoked the "foreign terrorist" label for the AUC.  Secretary Kerry announced that "the circumstances that were the basis fo the designation … changed in such a manner as to warrant revocation fo the designation."  Federal Reporter Doc. 2014-16627, Public Notice 8795, filed July 14, 2014.

continuously minimizes the very important role played by Mr. Mancuso in achieving this

objective.  Despite opposition by other bloque commanders, Mr. Mancuso rallied other behind

Colombia's efforts to obtain peace.  The government's sentencing memorandum solely paints

Mr. Mancuso's involvement with the AUC from 1997 to 2003, completely glossing over his

actions between 2004 to 2008, a period which has been universally recognized as contributing to

stabilization of what was an otherwise a war-torn country.

Mr. Mancuso was extradited to the United State to face drug trafficking charges and not

because of his membership in the AUC.  Yet the government spends a significant part of their

sentencing argument recounting the atrocities committed during the Colombian civil war.  ███

████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████

What is more significant about this period is not only what Mr. Mancuso accomplished,

but also the fact that from December 10, 2004, the day he officially demobilized until the

present, he  abstained from further criminal activity.  Furthermore, it was an act of good-faith

that led Mr. Mancuso to demobilize one-year early and attempt to convince other paramilitary

members to join him.  His effort was controversial and brought death threats from fellow

paramilitary members including some extradited to this country including: Carlos Mario Jimenez

---

[10] There has been a philosophical dispute between Colombian and the United States regarding the issue of punishment vis-à-vis cooperation.  On one hand former President Uribe sought harsh sentences for former AUC members extradited to the United States.  On the other hand, former U.S. Ambassador to Colombia, William Brownfield, raised the question as to what should be the priority in these cases.  He posed the following question, "do we want maximum sentences or maximum cooperation for the future?  Because one is not the same as the other."  The government of the United States choose to seek Mr. Mancuso's cooperation.  Having taken advantage of the information provided, the government now seeks to dilute the effects of his cooperation by asking for an exemplary punishment under the Sentencing Guidelines.

aka "Mocho," Ramiro "Cuco" Vanoy, and Diego Fernando Murillo Bejarano aka "Don Berna."

Each defendant either did not cooperate with U.S. justice, or failed to cooperate successfully.

In 2005, Colombia's Congress passed the Justice & Peace Law, which established a legal framework for the demobilization of paramilitary and guerilla members to offer legal clemency and public benefits to any guerrilla or paramilitary member in exchange for an agreement to disarm, forfeit assets, and tell the truth about violations of law they committed. If AUC members like Mr. Mancuso fulfilled the requirements of the Justice & Peace law, they were eligible for sentences of five to eight years.

The Honorable Mario Iguaran, Attorney General of Colombia during this period, acknowledged that there was no evidence that Mr. Mancuso had engaged in further criminal activity following his demobilization as described to Mr. Mancuso's U.S. prosecutor, Robert Spelke, and DEA Special Agent, Kevin Schreiber. This course of conduct was further supported by the successful progression of Mr. Mancuso's Justice & Peace process last year with two sentences being imposed (See Exhibit 21). Such an accomplishment would not have been possible if further criminal conduct would have been reported or charged.

Upon his arrival to the United States, Mr. Mancuso could have opted to withdraw from further cooperation with Colombia and the United States. Yet, such a decision would have been contrary to the best interests of this country. The United States has spent considerable financial and political resources improving accountability, strengthening the rule of law and combating impunity in Colombia. Mr. Mancuso's withdrawal from Justice & Peace would have effectively deprived the Colombian courts and prosecutors from achieving such objectives. Therein lies the significance of Mr. Mancuso's action after being extradited to the United States.

10

Mr. Mancuso's timely decision to enter into a cooperation agreement in this case, together with his willingness to continue to testify before the Colombian Supreme Court and in other criminal proceedings, displays a great degree of commitment and sincerity. ██ ████████ ███ ████ █████████ ███ █████████ ████ ██ ███ ██████ █████ ███ ████████. ███ ██████ ████ ███ ██ ███ ██████████████, █████████████ ███ █████████████ ██ █████████ ████████████ ████ █████████, ███████████ ██ ██████████ ██████████ ██ █████████, ███ ██████ ██ █████████ ███████ ██ █████ ███ ██████ ██ ████████ █████ ████ ██████████ ███/██ ████████████ ██ ██████ ███ ███████ ██ ██████████ ██ ████ ██ █████, ███ █████████ █████████ ██ ███████.

Mr. Mancuso's actions in spearheading the demobilization process of the AUC, together with his acknowledgments of past mistakes, and efforts to compensate the victims of the civil war are very significant. These remorseful actions demonstrate character and that he is no longer a risk of harm to society. 18 U.S.C. § 3553 (a) (1). His efforts in promoting peace and reconciliation in Colombia and, thereby strengthening the rule of law, should also be considered in determining an appropriate term of imprisonment. Furthermore, he is not likely to recidivate upon release from prison. On the contrary, Mr. Mancuso's efforts and sacrifice laid the ground work for the peace talks currently taking place in which the Colombian government is seeking the demobilization of the FARC.

The chronology of events leading up to the execution of the plea agreement signed on October 14, 2008, is relevant to the Mancuso's extraordinary acceptance of responsibility. In lieu of waiting to assess the strength of the government's case, or attempting to bargain for a better deal, he trusted the government to eventually recognize the extent and value of his cooperation. Other extradited paramilitaries had been able to extract major concessions from the government. In Mancuso's case, he acknowledged responsibility for his own personal acts, as well as those

committed by others.  For instance, he admitted that he oversaw the production of over 138,000

kilograms of cocaine although he was not personally in charge or involved directly in the

exportation of such large quantities.

### Seriousness of Offense and Deterrence
### of Criminal Conduct - 18 U.S.C. § 3553 (a) (2) (A-C)

Mr. Mancuso has never denied that he violated the law.  By his plea, he acknowledged

his involvement in the importation of a significant amount of cocaine, that he was a supervisor,

and that firearms were possessed in connection with the offense.  His extremely high guideline

calculation clearly takes into consideration the offenses and conduct that he is pleading to:  a

base offense level of 38, with a four level enhancement for his leadership role, and a two level

increase because of firearms were used in arriving at a arriving at a adjusted offense level of 44,

equivalent of a life sentence.  This, however, is not the end of the inquiry as the Court needs to

consider factors relevant to his post-criminal conduct behavior.  Here, Mr. Mancuso is entitled to

a three-level reduction for acceptance of responsibility because four months after arriving in the

United States he acknowledged responsibility and pled guilty to the charges.

The inquiry then becomes where within the guideline the Court should begin analysis of

Mr. Mancuso's sentence.  It is unusual to find a case in which a defendant accepts responsibility,

spend seven years cooperating with the government of the United States and Colombia, exposes

himself and family to danger, and yet the government still asks for the high end of the sentencing

guidelines.  His conduct since 2004, when he surrendered to Colombian authorities, or May 13,

2008, when he arrived in the United States, shows that he is a person that has made amends for

his past criminal conduct.  Mr. Mancuso has exhibited exemplary conduct over the last eleven

years, he has accepted responsibility for criminal acts and guideline enhancements; he now faces

a total offense level of 41 (324 to 405-months), and yet the government fails to advance any additional reason why the high-end of the guideline is appropriate.

The only argument advanced by the government is that somehow "the sentence should afford adequate deterrence to criminal conduct." Government's Memorandum in Aid of Sentencing, Pg. 26.  A sentence at the low end of the guidelines, which is the equivalent of more than 18-years of imprisonment, certainly sends a message that this conduct will not be condoned. On the other hand, Mr. Mancuso's atonement and rehabilitation during the last eleven years should also be recognized.  He has acknowledged before a nationwide audience in Colombia the mistakes he has made during the 1997-2003 period.  This is a person who has come full circle, who started off with noble intentions, lost his moral compass, and who for the past ten years has been atoning for his sins.

**Imposition of A Sentence Sufficient But Not
Greater Than Necessary Sentence – 18 U.S.C. § 3553 (a)**

Once the Court arrives at the appropriate sentencing guideline range, it must then look at other factors that may warrant a sentence sufficient, but not greater than necessary, to accomplish the goals outlined in 18 U.S.C. § 3553 (a).  Pursuant to the plea agreement, the government is required to advise the court of the assistance Mr. Mancuso rendered to the United States and Colombia as part of the Justice & Peace process and para-political investigations.  Over the course of the last ten years (even before arriving in the United States), Mr. Mancuso has appeared more than 100 times before different judicial and prosecutorial bodies outlining his involvement in different crimes that were committed while a member of the AUC.

As part of his cooperation, he has detailed all of his crimes, and has identified illegally gained property that he acquired during his membership in the AUC.  The Colombian court's have confirmed that he has been truthful, and that he has forfeited his illicit assets to provide

financial reparations to the victims, thereby, complying with the Justice & Peace Law.  More importantly, his testimony before different judicial bodies, including the Supreme Court of Colombia, has led to investigations and convictions of over 50 elected national figures that had corrupt ties with the AUC.

The Colombian government has acknowledged that as a direct result of his cooperation, almost 30 to 35% of the congressional representatives elected in 2002, were subsequently, prosecuted and convicted.  See Government's Sentencing Memorandum, Pgs. 20-21.  The scope of the cooperation, however, does not end there.[11] ████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████ Information about these corrupt law enforcement officials was particularly helpful since they headed institutions that were working closely with United States law enforcement officers and operations.  Thus, this was an area, in which, Mr. Mancuso's testimony in Colombia directly and indirectly helped the United States.

---

[11] Mr. Mancuso alerted members of the Supreme Court of Colombia that they been the targets of illegal acts, including wiretaps and surveillance.  Moreover, the Executive Branch of Colombia engaged in a pattern of deceptive acts, including the procurement of false testimony against members of the Judicial Branch.  Mr. Mancuso was the first to denounce such acts and took steps to advise members of the judiciary of the telephone interceptions and other efforts to undermine the integrity of the court.   See, Exhibit 10: ("Mancuso denuncia complot contra la Corte…" [Mancuso denounces plot against the Court])

In considering a variance in this case, this Court should give due deference to Mr. Mancuso's compliance with the Justice & Peace Law. The provisions of this law are relevant to this Court's analysis since they closely resemble the United States Sentencing Guidelines. Those who acknowledge responsibility, disclose criminal activities, and agree to provide restitution and compensation to the victims are measured by a different standard than those that challenge the system.

Under the Sentencing Guidelines, the filing of a §5K1.1 motion also recognizes those who acknowledge responsibility and disclose criminal activities, and allows the court to impose a sentence outside the guidelines taking into consideration the level of contrition of the defendant. The rationale for the amnesty provisions of the Justice & Peace Law is important in light of the government's argument that the violence attributed to the AUC should be considered in imposing sentence. To end the circle of violence the Colombian society provided an incentive for individuals to demobilize and lay down their arms. Society, therefore, deemed that peace and civil stability outweighed the imposition of punitive sanctions otherwise warranted by a violation of the criminal code. Colombia's turbulent history of civil unrest and violence, should not be a polestar in imposing sentence. Mancuso was extradited because of his drug trafficking activities and not because of the violence attributed by the government to the AUC.

The efforts by Mr. Mancuso to seek peace and reconciliation, to demobilize and attempt to convince others to also do so, reflect his remorse. His compliance in providing restitution, and his truthful testimony with law enforcement and prosecutors, are powerful and undeniable acts of remorse and rehabilitation. It is because of these acts that Mr. Mancuso has demonstrated that he is not a risk to society. 18 U.S.C. § 3553 (a) (2). Additionally, Mr. Mancuso respectfully submits that if one voluntary act is to taken into consideration as rehabilitation by this Court, he

submits it should be his effort to contribute and substantially assist justice, efforts for peace, and reconciliation and bolstering of democracy in Colombia.  18 U.S.C. § 3553 (a) (2).  Mr. Mancuso respectfully asks the Court to consider his efforts to cooperate and assist his country as mitigation of his past criminal conduct.

### The Danger of Cooperation to Personal & Family Circumstances

As a result of his extraordinary efforts to provide assistance to the United States, Italy and Colombia, Mr. Mancuso placed himself and his family in danger.  U.S.S.G. §5K1.1 (a) (4).  ▮ ▮ not only has engendered the enmity of drug traffickers, but he also retaliation from important members of the law enforcement and military community in Colombia against whom he testified.  Those individuals are connected to powerful people, including active members of the law enforcement community and government who feel betrayed by Mr. Mancuso's actions ▮ ▮ ▮ Mr. Mancuso has already suffered an attempt on the life of his eleven-year-old son[12], the assassination of some of his closest friends[13], and direct threats against his parents[14] and wife[15] These threats and reports of violence have been relayed to the government, to the Department of Justice and NDDS,[16] members of the Supreme Court of Colombia and Justice & Peace judges.[17]



- surveillance of family and attorneys;
- assassination of personnel that aided Mr. Mancuso as he erradicated thousands of acres of coca crop (see Exhibit 12) including friends Aran Assias and his 19-year-old son Andrés who assisted in the erradication of coca to that criminal organizations would not seize them. See Exhibit 14 "Noticia del asesinato de Aran Assias, su hijo Andrés Alberto Assias y Carlos Londoño;"
- assassination of Carlos Londoño Mora, project coortinator to compensate victims and reintegrate demobilized members of the AUC.;
- assassination of Ocar Zapata who was at Mr. Mancuso's side during the erradication effort, and reintegration of demobilized AUC members (See Exhibit 15 - Open letter to the President of the Republic, The MAPP OAS, The Ministers of Defense and Interior and Local Authorities.);

Yet, no efforts have been made to provide for the security of Mr. Mancuso's family. Independent of what happens in this case, Mr. Mancuso and his family will live in fear of retaliation for the rest of their lives.[18]

## Conditions of Confinement

To comply with his obligations under the plea agreement and to be in a position to provide assistance to the United States and Colombia, Mr. Mancuso has been confined to the CTF facility in Washington, D.C., and more recently the Northern Neck Regional Jail in Warsaw, Virginia during the course of the last seven years. The delay in the sentencing was, in part, the result of the request of Colombian authorities for his cooperation.

Both facilities are temporary detention prisons, housing transitional inmates pending quick resolution of their cases. While both facilities are professional and high-quality, they are transitional, which means an unstable inmate environment. If Mr. Mancuso had been sentenced early on, he would have been designated to a federal institution where the conditions of confinement and available programs would have been significantly better.

Additionally, prior to the time confined in the U.S., Mr. Mancuso was confined to several maximum-security institutions in Colombia facing deplorable and debilitating conditions. All in all, with the exception of CTF, Mr. Mancuso has only been able to see his son through a glass

---

- family, friends and attorneys of Mr. Mancuso suffered false arrests, detentions and were drugged in an effort to learn of his cooperation and threaten further cooperation;
- those who demobilized with Mr. Mancuso were killed, intimidated, and threatened for their efforts.

[18] The threats to Mr. Mancuso, the attempted assassination of his son, and other threats to his family have come from criminals and present and former AUC commanders – commanders of strong military, financial and political power: groups such as the "Traquetos," the "Urabaeños," and the "Águilas Negras" stemmed from AUC commanders such as Carlos Mario Jimenez aka "Macaco," Daniel Rendon Herrera aka "Don Mario," Ramiro "Cuco" Vanoy, y Diego Fernando Murillo Bejarano aka "Don Berna." Commanders that were not subordinate to Mr. Mancuso, and superior in the sense that they had no second-thoughts about threatening Mr. Mancuso. The threat forced one part of Mr. Mancuso's family to leave Colombia for protection.

and has not had any physical contact with any family member.  This Court has the ability to take

into considerations the conditions of imprisonment in the United States and Colombia during the

past 9-years when fashioning an appropriate sentence.

Respectfully, Mr. Mancuso requests that the Court vary downward and mitigate his

sentecne based on the extraordinarily harsh prison conditions in Colombia.  The U.S. Department of

State found the Colombian prison system failing, poorly financed, poorly trained and corrupt.[19]

Report on Human Rights, 2005, U.S. Department of State, Bureau de democracia, derechos

humanos y laborales (08 de marzo de 2006).

Amnesty International also reported about the inhumane conditions at the Colombian

prisons.  *See* Amnesty Int'l, Amnesty International's Briefing to the UN Committee against

---

[19] Below is an excerpt from the State Department Report:

The National Prison Institute (INPEC) runs the country's [Colombia's] 139 national prisons and is responsible for inspecting municipal jails. Although part of the Ministry of Interior and Justice, INPEC has an independent budget and administrative decentralization. With the exception of new facilities, prison conditions were poor, particularly for prisoners without significant outside support.

Many of INPEC's 8,757 prison guards and administrative staff were poorly trained or corrupt. Overcrowding, insecurity, corruption, and an insufficient budget continued to be serious problems. As of March there were more than 69 thousand prisoners held in spaces designed to accommodate fewer than 50 thousand, an overcrowding rate of nearly 40 percent. In 13 institutions overcrowding exceeded 100 percent, and in Bucaramanga's penitentiary, where more than 2 thousand prisoners lived in a space designed for 664, the rate surpassed 200 percent. INPEC representatives estimated that nine thousand guards would be needed to provide adequate security. The Committee in Solidarity with Political Prisoners (CSPP) noted a decrease in corruption resulting from improved training, increased supervision, and more accountability for prison guards.

Budget problems affected prisons in many ways. At Combita Prison lack of money to pay sanitation fees led to water rationing. During the year INPEC spent approximately $2 (4,990 pesos) per day on each inmate for food. Private sources continued to supplement many prisoners' food. CSPP reported that the doctor to patient ratio was as low as 1 to 1,200 in some institutions and noted that INPEC failed to negotiate a nationwide healthcare contract for all its facilities.

Authorities sometimes failed to prevent deadly violence among inmates. INPEC reported that from January to June, there were 20 violent deaths among inmates related to fighting and riots. In March a fight between inmates at Villahermosa jail in Cali resulted in two deaths. During this period there were 56 escapes, including 44 because of security failures and 1 with the aid of outside assistance.

Torture on the Republic of Colombia (2003).  The *Amnesty* report noted that prisoners "have been left exposed for long periods of time to the sun and rain," are forced to "shower in the open air and left outside for periods of about an hour without being able to dry themselves or dress," and have "reportedly been given rotten food or food which appears to have been contaminated." *Id.*

Mr. Mancuso asserts that his inhumane pre-sentence confinement merits the Court's consideration at sentencing.  *See United States v. Carty*, 264 F.3d 191, 196 (2d Cir.2001) (The court ruled "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures…".  Sentence was vacated and remanded for reconsideration in light of conditions of pre-sentence detention in Dominican Republic)[20]; *United States v. Mateo*, 299 F.Supp.2d 201, 212 (S.D.N.Y.2004) (A downward departure was granted where pre-sentence conditions "effectively enhanced, to a disproportionate degree, the level of punishment contemplated to be experienced by inmates in the typical case during the period of incarceration prescribed by the Guidelines."); *United States v. Fajardo*, Slip Op. 3498640, pp.3-4  (S.D.N.Y., Dec. 5, 2006) (The court ruled that a downward departure was not available given a mandatory minimum, however the court did take note of the conditions of pre-sentence detention.).

---

[20]  The decision in *Carty* states in relevant part:

> According to the Sentencing Guideline Manual, a sentencing court may depart if the court finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." U.S.S.G. § 5K2.0 (quoting 18 U.S.C. § 3553(b)). No evidence exists to show that the Sentencing Commission took the conditions of a pre-sentence detainee's confinement into account in creating the Guidelines. Indeed, there is no indication that the Commission contemplated that federal pre-sentence detainees would be kept in any detention facilities other than federal facilities. *See United States v. Francis*, 129 F.Supp.2d 612, 616 (S.D.N.Y.2001). Accordingly, we hold today that pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures.

*Carty,* at 196.

Consideration of pre-sentence confinement is also appropriate under 18 U.S.C. § 3553. Specifically, the court must also give due consideration to the remaining factors identified in 18 U.S.C. § 3553(a), in order to impose a sentence "sufficient, but not greater than necessary," as required by the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 2005). *See also, United States v. Crosby*, 397 F.3d 103 (2nd Cir. 2005). Any sentence imposed by this Court would be greater, given the pretrial and pre-sentence detention conditions, than one imposed for a defendant incarcerated solely in this country. Accordingly, a downward variance is warranted under U.S.S.G. §5K2.0, as well as mitigation under § 3553 (a).

A number of courts have found that a judge has the authority to grant a downward departure under the US Sentencing Guidelines based upon substandard conditions of pre-trial or pre-sentence confinement. *See United States v. Brinton,* 139 F.3d 718, 725 (9th Cir. 1998); *United States v. Hernandez-Santiago*, 92 F.3d 97, 101 n.2 (2nd Cir. 1996); *United States v. Sutton,* 973 F.Supp. 488, 492 (D.N.J. 1997). In light of *Booker,* the Court also has the authority to vary downward from the guideline range given the defendant's non-federal confinement.

<u>Exemplary Jail Behavior</u>

While detained in the United States, Mr. Mancuso participated in numerous programs and classes. Initially, Mr. Mancuso attended self-help and "English As A Second Language" classes at the CTF facility in Washington, D.C. It was also at this facility that Mr. Mancuso studied for and attained his GED. The GED certificate, program progress reports, and program completion certificates are attached to this memorandum as exhibits. (*See,* Exhibit 20, Jail & GED Certificates.)

**Smith Departure**

Mr. Mancuso respectfully requests that the Court reduce his sentence by 6-months under the authority of *United States v. Smith,* 27 F.3d 649 (D.C. Cir. 1999), acknowledging that because the defendant is a foreign national, he would endure a harsher sentence than a prisoner serving the same sentence but being a U.S. citizen and having the options provided by the Bureau of Prisons for pre-sentence release.

Respectfully submitted,


/s/ Joaquin Perez
JOAQUIN PEREZ
Florida Bar No. 335339
6780 Coral Way
Miami, Florida 33155
Telephone: (305) 261-4000
Facsimile:   (305) 662-8715
jplaw1@bellsouth.net


**CERTIFICATE OF SERVICE**


**I HEREBY CERTIFY** that a true and correct copy of the foregoing was filed under seal this 30th[th] day of March, 2015 and an electronic copy was sent to AUSA, Paul Laymon.

*/ s / Joaquin Perez*