UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Criminal No. 02-388-02 (ESH) |
| | : | |
| | : | |
| SALVATORE MANCUSO-GOMEZ | : | |
|   a/k/a "El Mono," | : | |
|   a/k/a "Santander Lozada," | : | |
|     Defendant. | : | |
| | : | |

## GOVERNMENT'S REDACTED MEMORANDUM IN AID OF SENTENCING AND MOTION PURSUANT TO U.S.S.G. § 5K1.1

The United States, by and through its attorneys, hereby submits this memorandum in aid of

the sentencing of defendant Salvatore Mancuso-Gomez ("Mancuso" or "the defendant"), and,

because the defendant has provided substantial assistance in the investigation or prosecution of at

least one other person who has committed an offense under United States law, moves to reduce the

defendant's sentence pursuant to § 5K1.1 of the United States Sentencing Guidelines.[1]   Having

taken into account the defendant's criminal activities, his background, and the assistance he

provided to the United States, as set forth more fully below, the government respectfully requests

that the defendant be sentenced to no less than 263 months imprisonment.   The government

makes this recommendation primarily on account of the enormous quantity of cocaine that the

defendant imported in to the United States, his high-level leadership position within the

*Autodefensas Unidas de Colombia* ("AUC"; the United Self Defense Forces of Colombia), a

terrorist, paramilitary and drug trafficking organization in Colombia, and his cooperation since

---

[1] This motion is not additionally based on Title 18, United States Code, § 3553(e).   The plea agreement in this case does not obligate the government to file a § 3553(e) motion.   See Plea Agreement, filed October 14, 2008, paras. 14, 15, and 17.

1

October 2008 with United States law enforcement authorities.

## I.     Introduction

### A. The Stipulated Facts, contained in the Statement of Facts in Support of Defendant's Plea of Guilty, summarizes the defendant's misconduct and atrocities committed by the AUC

As part of the plea agreement in this case filed on October 14, 2008, the parties agreed to a

Statement of Facts In Support Of Defendant's Plea of Guilty.   The statement of facts accurately

depicted the AUC, which was at the time of the indictment a designated Foreign Terrorist

Organization (FTO)[2], as one of the largest, most prolific drug trafficking organizations in the

world.[3]   That document provided a factual basis to substantiate the defendant's guilty plea,

summarized as follows:

> The defendant was a leader of the AUC, a federation of right-wing, self-defense, paramilitary style groups that was initially formed in approximately 1997 to undertake responsibility for protecting Colombian citizens from left-wing guerilla organizations dedicated to the overthrow of the Colombian government.   The AUC financed their operations by producing, selling and distributing cocaine.
>
> The AUC consisted of approximately 30,000 armed soldiers organized into blocs (or regions) with commanders for each bloc.   The defendant commanded soldiers in two blocs of the AUC.   In 2002, the AUC command structure was re-formed by its original

---

[2]  The AUC was designated a Foreign Terrorist Organization (FTO) by the State Department on September 10, 2001, and was so designated until removed from the list in July 2014. The complete FTO list is maintained by the State Department, see http://www.state.gov/j/ct/rls/crt/2013/224829.htm.

[3]  The AUC "became arguably the largest drug trafficking organization in the world….Distinguishing the AUC from drug cartels was its ideological nature [but eventually] the alliances with drug trafficking groups eventually made the AUC indistinguishable from [them]." See http://colombiareports.co/understanding-colombian-conflict-drugs, 1/14/15.

founders, brothers Carlos Castano-Gil and Vicente Castano-Gil.   Thereafter, the AUC was led by four individuals – the Castano brothers, Ramon Isaza, and the defendant, Salvatore Mancuso, who was officially designated the commander of the Cordoba and Uraba blocs. Directly accountable to the four principal commanders were 12 sub-commanders, including Rodrigo Tovar-Pupo, a/k/a "Jorge 40."

The defendant acknowledged that he, Carlos Castano-Gil, Juan Carlos Sierra-Ramirez, and others conspired to import cocaine into the United States.   The defendant used his position in the AUC to manage the production, distribution and transportation of large quantities cocaine ultimately imported in to the United States.   For example, in the Cordoba bloc alone, the defendant supervised the production of approximately 2,000 kilograms of cocaine per month.   During the period of the conspiracy, the defendant oversaw the production in Cordoba of 138,000 kilograms of cocaine, the vast majority of which was smuggled into the United States.

In regions controlled by the AUC, all aspects of the cocaine trade -- from the farmers to the labs to the transportation – were directed and protected by soldiers under the direction of by AUC leadership, namely Castano and Mancuso.   Cocaine sold or distributed by the defendant was transported under the security of AUC solders to the northern coast of Colombia and loaded onto ships bound for the United States and Europe. For example, between March 19, 1999 and September 12, 2000, at least seven shipments of cocaine from the defendant's Cordoba bloc were smuggled into the United States. Those shipments contained a total of 4,414 kilograms of cocaine.   In an interview with the media in 2004, the defendant stated that the AUC received 70% of its money from taxing drug traffickers.

Ultimately, the defendant surrendered to Colombian government authorities and began participating in Colombia's Justice and Peace Program, designed to have AUC members voluntarily surrender their arms and truthfully disclose their criminal activity.[4] During his Justice and Peace participation, the defendant admitted to being involved in the murders of military targets, mayors, drug traffickers and peasants.    The defendant admitted responsibility for the massacre of 42 people in February 2000 in Bolivar, Colombia, though the available evidence suggest that more than 100 civilians were killed and tortured.    In addition, AUC soldiers committed 15 massacres between May 29, 1999, and September 1, 1999, in which 145 people were killed.    On January 17, 2001, AUC soldiers killed 27 people in Sucre, Colombia.

### B.  Brief History of the AUC

Stanford University, in its work on "Mapping Militants," has summarized the history of the AUC.   This work can be found at the following Stanford University website: http://web.stanford.edu/group/mappingmilitants/cgi-bin/groups/view.    This work notes that the AUC was formed in 1997 when several militia groups joined forces to battle the left wing guerilla group known as the FARC.[5]   *Id.* at 1. The AUC operated in the northern and central regions of Colombia, and at least initially, the AUC's primary goal was to hunt and kill leftist guerillas operating in Colombia, though the AUC also targeted towns and individuals that sympathized – or that were perceived to have sympathized -- with the guerillas.   *Id.* at 3.   Targeted assassinations,

---

[4]  On December 10, 2004, Mancuso and 1,437 members of the Bloque Catatumbo demobilized by voluntarily surrendering to the Colombian government in Santa Fe de Ralito, in the Department of Cordoba, a territory of 25,000 square kilometers, where Mancuso and his troops were permitted to live in houses built especially for them.   Mancuso resided in Cordoba and was free to move around Cordoba, receive guests, and travel home.   Other bloques demobilized later.   For instance, 925 members of Bloque Cordoba demobilized on January 18, 2005.

[5]  The FARC is also a designated FTO.   See: http://www.state.gov/j/ct/rls/crt/2013/224829.htm.

kidnappings, torture, and execution were among the AUC's more widely used tactics, and victims included peasants, politicians, and journalists. *Id.* Trade unions and unionists were major targets for the AUC, as well, because they allegedly interfered with the right to work. *Id.* The AUC's primary sources of income were drug trafficking and the illicit activities related to it, including the taxation of growers and protection payments. *Id.* As the AUC became more involved in the drug trade and increased in size, the AUC's crimes against civilians increased, such that in 2001 the AUC was responsible for 70% of registered human rights violations in Colombia.[6] *Id. at 5.* Starting in July 2004, the AUC began negotiating a peaceful surrender to Colombian authorities, and, by 2006, more than 23,000 AUC members had reportedly disarmed.[7] *Id.* at 4.   The defendant was identified in the report as a top military commander who became the top political chief of the AUC after the death of Carlos Castano, one of the original founders of the AUC. *Id.* at 2.

The United States Department of State, in its annual *Country Reports on Terrorism,* issued

---

[6]  The AUC eventually began targeting innocent civilians, not just civilians connected to the FARC.   For instance, many farmers were forced at gunpoint by the FARC to provide them with food or temporary shelter; the AUC then used this duress-related conduct against the civilians by claiming they had sympathized with the FARC. Likewise, many families were forced to give over their teenage sons and daughters to the FARC as soldiers and other uses, after which the AUC blamed the families for sympathizing with the FARC.   Other AUC targets included Colombian government authorities, as well as police, military, and political figures.   One commentator wrote that the "[AUC] have proven themselves particularly adept at show killings and massacres that victimize unwitting civilians and leave an indelible mark on the popular consciousness."   See, e.g., "The Ambiguous Nature of Collaboration in Colombia," Eric Fichtl, March 29, 2004, at the website http://colombiajournal.org/the-ambiguous-nature-of-collaboration-in-colombia.htm.

[7]  Some believed that peasants and unemployed people, who were not AUC members, were paid to demobilize as AUC soldiers, to give a greater impression of demobilization than was true. Thousands of AUC guerillas and some leaders did not demobilize, and formed into separate criminal groups which continued to traffic drugs and engage in other crime. *See* Human Rights Watch, World Report 2009, page 1, at http://www.hrw.org/world-report-2009/colombia; and, Verdadabierta.com, "The Fiction of the Mobilization of the Bloque Nutibara," March 7, 2011, at www.verdabierta.com/justicia-y-paz/versiones/371-el-aleman-freddy-rendon-herre.

on April 28, 2006, described the AUC status in 2005 and 2006.    The State Department report

echoed the work of Stanford University noted above.    The State Department reported that the

AUC was formed in 1997 to retaliate against leftist guerillas fighting the government of Colombia

and the landed establishment, but quickly discarded this mission and elected instead to involve

itself in drug trafficking. *Country Reports on Terrorism,* Chapter 8, Foreign Terrorist

Organizations, April 28, 2006, page 24. The State Department reported that by 2006, most of the

AUC's centralized command structure had been dismantled and nearly all its top paramilitary

chiefs had stepped down.    *Id.*

### C.    Procedural Background

The plea agreement, filed on October 14, 2008, provides as follows: "only information that

proves useful to investigations and prosecutions on behalf of the United States government will be

considered for substantial assistance" (paragraph 14(B), page 6), and substantial assistance "will

be based solely on information and other assistance provided that concerns potential defendants

and offenses that may be prosecuted in the United States" (paragraph 15, page 8).    The rationale

for this limitation was explained in a footnote: "this provision ensures that the Defendant will not

get a "double benefit" for information that he provides pursuant to this plea agreement ... [and]

under the Justice and Peace Act" (note 4, page 8).    However, the plea agreement also provides

that the United States would notify the District Court, pursuant to Title 18, United States Code,

Section 3553(a), about the defendant's "past and present cooperation with the Colombian

government in this process as well as all other information that Defendant provides to assist the

Colombian government" (paragraph 14(B), page 6).    This provision was added to the plea

agreement to give the defendant an incentive to cooperate with the Justice and Peace process and

the para-political investigations (explained supra), and to require the United States to bring this to

the Court's attention.

The defendant assisted authorities in the United States and Colombia, and in one case, he assisted authorities from Italy as well.   Although this downward departure motion is based only upon his assistance to United States law enforcement authorities in cases connected to the United States, this motion will first describe his assistance to the United States, then will describe his assistance to Colombia.

The defendant began cooperating with United States authorities soon after being extradited to the United States in May 2008.[8]   As outlined in the Statement of Facts noted above, the defendant was a high ranking paramilitary commander who became one of the four supreme leaders of the AUC, joining and serving on the central committee which led the AUC, and is arguably the highest ranking AUC official ever extradited to the United States.   Among other criminal activity,[9] Mancuso had control over a significant part of AUC drug trafficking matters, which were enormous in scope, and was entrusted for several years with overseeing the drug trafficking activities of the AUC.   As a result, Mancuso possessed a great deal of information and influence concerning international drug trafficking.   Consequently, he was in a better position – unlike many cooperators -- to provide high-level information to United States law enforcement authorities.   This gave him the opportunity to provide substantial assistance to the United States. Some of this information contributed to investigations or prosecutions in the United States.

---

[8]  The defendant's extradition from Colombia to the United States was highly publicized in Colombia. See, for example, *El Tiempo*, 5/21/2008, "The images of 14 men from the paramilitary leadership [including Mancuso] … climbing the jet bridge stairs to a DEA aircraft … will forever be memorable."

[9]  The defendant also had supervisory authority in other criminal AUC activities and relevant sentencing conduct, including extortion and bribery of government and military officials.

In connection with United States cases, Mancuso was debriefed more than 30 times.   He appeared to be a truthful and committed cooperator, and typically answered questions in great detail.   He never testified in the United States, though he was willing to do so, and, as noted below, the information he provided to the United States, in at least one case, resulted in charging and arresting a major Colombian trafficker in the United States.   The significance of his cooperation is discussed below.

**II. Assistance to the United States**

**B. Other United States cases**

The defendant has been interviewed by prosecutors and agents from around the country concerning many other targets and defendants.    As noted below, some of the information provided to these prosecutors and agents had value to the United States.    However, in most instances, the defendant's information was not used to obtain an indictment or plea or trial conviction, but only corroborated information already possessed from other witnesses or sources of information.    Nevertheless, the information as to these other targets was of at least some value in the investigation or prosecution of others in the United States.

In September 2004, well before the defendant began cooperating with the United States, Fabio Enrique Ochoa-Vasco and his lieutenant John Gallego-Valencia were indicted in Tampa for trafficking cocaine.    [MDFL case no. 08-374.]    Ochoa-Vasco[10]  was a major Colombian trafficker associated with the Medellin cartel and the AUC, who transported tons of cocaine to the United States.    Ochoa-Vasco was arrested in Venezuela in 2009, sent to the United States, and, in September 2009, pleaded guilty to trafficking cocaine.    The defendant did not assist in the indictment of Ochoa-Vasco.    However, after he was extradited to the United States in May 2008, Mancuso did provide significant information about his extensive drug dealings with Ochoa-Vasco, including documentary information of drug transactions between Mancuso and Ochoa-Vasco. Mancuso was interviewed by the case agent and prosecutor, and the information, combined with a significant amount of other independent information, ultimately assisted the United States at sentencing. Ochoa-Vasco eventually pleaded guilty and was sentenced to 18 years. Mancuso's

---

[10]  Fabio Enrique Ochoa-Vasco is not related to another major Colombian narcotics trafficker with a similar name: Fabio Ochoa-Vasquez, a leader of the Medellin Cartel who was convicted in the Southern District of Florida following a jury trial in 2003 and sentenced to 30 years in prison.

identity and the information provided was not specifically disclosed to the defendants in that case.

John Gallego-Valencia worked closely with Ochoa-Vasco and was Ochoa-Vasco's brother in law.   Gallego-Valencia surrendered to United States authorities, pleaded guilty, and eventually was sentenced to 14 years.   [MDFL case no. 08-374.]   Gallego-Valencia was indicted before the defendant began cooperating with the United States, but Mancuso provided information concerning his dealings with Ochoa about one year before Gallego-Valencia surrendered. Although Mancuso neither assisted in convincing Gallego-Valencia to self-surrender nor plead guilty, his information corroborated other information possessed by the government against Gallego-Valencia.

Rodrigo Tovar-Pupo, a/k/a "Jorge 40," was indicted in the District of Columbia well before Mancuso began cooperating with the government.[11]   Tovar-Pupo was also a high-ranking AUC commander and trafficker who worked directly for the defendant.   Working under Mancuso's supervision, Tovar-Pupo controlled a large area of northern Colombia, which allowed Tovar-Pupo to regulate and tax coca farmers, coca labs, cocaine transporters, and cocaine traffickers on behalf of the AUC.   Tovar-Pupo provided much of these drug taxes to Mancuso, regularly meeting with Mancuso to account for the taxes collected.   Like Mancuso, Tovar-Pupo himself became an independent drug trafficker by purchasing cocaine and becoming an investor in large loads of cocaine, a large portion of which eventually went to the United States and Europe.   After Mancuso was extradited to the United States, he provided significant information about Tovar-Pupo and was willing to testify against Tovar-Pupo if Tovar-Pupo elected to go to trial.

---

[11]  DDC Case no. 04-114-09 (RBW).

Tovar-Pupo did eventually plead guilty, but sought to withdraw his guilty plea.[12]   After lengthy

litigation on the motion to withdraw the plea, United States District Court Judge Reggie Walton

denied that motion in November 2014.   Mancuso did not testify at Tovar-Pupo's hearings before

Judge Walton, and no information provided by Mancuso was submitted at the hearing in support of

the government's position.   However, Mancuso continued to express a willingness to testify in

any proceeding involving Tovar-Pupo, if needed, including sentencing, which is scheduled for

April 2015.

Luis Castano-Alzate was indicted in the Middle District of Florida and the Southern

District of Florida and arrested, independent of any information provided by the defendant.

[SDFL case no. 04-20065; MDFL case nos. 07-195 and 12-015.]   However, after Castano-Alzate

was extradited to Tampa, the prosecutor and agent from Tampa interviewed the defendant.

Castano-Alzate had been an investor in coca labs and had trafficked cocaine with other AUC

commanders, including Ramiro "Cuco" Vanoy.   Mancuso provided information which

corroborated information already possessed by the government against Castano-Alzate.

Castano-Alzate eventually pleaded guilty to cases from both Tampa and Miami, and was

sentenced. Mancuso's cooperation was not disclosed to Castano-Alzate and is therefore not

believed to have influenced his decision to plead guilty.

Mancuso provided information about other drug traffickers and money launderers which

was of interest to the United States government, but was not sufficient on its own or in

combination with other information, to result in additional prosecutions, or it was not needed to

---

[12]   At the time Tovar-Pupo moved to withdraw his guilty plea, counsel for defendant Mancuso,
Joaquin Perez, represented both Mancuso and Tovar-Pupo.   When he originally entered a plea of
guilty, Tovar-Pupo was aware that Mancuso was prepared to testify against him.

further those investigations or prosecutions.    Although this information did not result in

indictments, arrests or convictions, it had value as historical information.

Significant drug traffickers about whom Mancuso provided information in this group

include Eder Pedraza-Pena, a/k/a "Ramon Mojana,"[13] Edward Cobos-Tellez, a/k/a "Diego

Vecino," Fredy Rendon-Herrera, a/k/a "El Aleman,"[14] Carlos Serralde,[15] Giorgio Sale and

Cristian Sale,[16] and Diego Murillo-Bejarano, a/k/a "Don Berna."[17]    For instance, Mancuso

provided information about Pedraza-Pena who had been previously indicted in New York and

Florida.    However, Pedraza-Pena was never arrested and thus, never extradited to the United

States.    Mancuso, although willing to further assist the United States government in the case

against Pedraza-Pena, could do nothing more to advance that investigation and prosecution.

Likewise, the information the defendant provided about the other drug traffickers was useful

background law enforcement information; nevertheless, it did not result into any actionable

investigations or prosecutions in the United States.

## III. Assistance to Colombia

After Alvaro Uribe Velez was elected president of Colombia in August 2002, President

Uribe began to negotiate terms for the demobilization of the AUC's military forces.    That process

went on for several years, and led to and was facilitated by the Justice and Peace law of 2005.

The law sought to bring peace between government of Colombia and the AUC, assist victims of

---

[13] SDNY case no. 09-242.
[14] SDNY case no. 04-962.
[15] SDNY case no. 03-1188.
[16] Italian police came to the United States and interviewed Mancuso about these father and son traffickers.
[17] SDNY case no. 03-1188.

the AUC and their families, and allow AUC fighters to reenter Colombian society.   The

agreement provided that AUC leaders facing criminal prosecution in Colombia for their numerous

atrocities would be eligible for reduced eight year sentences if, among other things, they fully

demobilized, voluntarily confessed their crimes, including detailed information about their victims;

made reparations to victims; returned stolen properties; turned in weapons; and committed no new

crimes. As a result, some, but not all of the AUC leadership voluntarily started the demobilization

process in exchange for significant legal benefits under the Justice and Peace law.[18]

Mancuso was among the first AUC leaders to surrender to Colombian authorities and begin

cooperating with the Colombian government and judicial authorities.   By the time Mancuso was

extradited to the United States in May 2008, a large part of the AUC had surrendered, and the

Colombian government was well into the long and continuing process of investigating the

countless atrocities and corruption perpetrated by the AUC.[19]   These investigations were handled

primarily by two different parts of the Colombian government - the Prosecutor General's Office, as

part of the Justice and Peace program, and by the Colombian Supreme Court, which had authority

to investigate political corruption, including corruption in the nation's legislative branch and

national and local governments.

The defendant was interviewed many times by investigators from the Justice and Peace

---

[18]   A summary of the Justice and Peace process is at the website for The Center for Justice and
Accountability, at http://cja.org/article.php; and, Lisa Laplant and Kimberly Theidon, "Transitional
Justice in Times of Conflict: Colombia's Ley de Justicia y Paz," 28 Mich.J.Int'l L. 49, 63-64 (Fall
2006).
[19]   President Alvaro Uribe stated publically that he extradited the AUC leaders because he believed
they had failed at the time to comply with all aspects of the Justice and Peace law.   *El Tiempo,*
5/21/2008; colombiajournal.org/colombia278.htm.   See also "Colombia Arrests Alleged Drug
Traffickers Wanted In US,"
http://colombiareports.co/colombia-arrests-alleged-drug-traffickers-wanted-in-us/, 8/13/12

program, including the Colombian Prosecutor General, and investigators from the Colombian Supreme Court, before and after he was extradited to the United States.    These interviews -- which took place in the United States -- typically occurred via video teleconference, though several Colombian investigators, and the Prosecutor General on one occasion, came to the United States and interviewed Mancuso in person.    Further, although the defendant never testified in any U.S. proceedings, he has appeared many times in Colombia Justice and Peace and Supreme Court proceedings via video teleconference. In the Justice and Peace program alone, Mancuso was interviewed or appeared more than 100 times.

### A. The Colombian Justice and Peace Program

The Justice and Peace law of 2005 provided that a demobilized AUC member had to apply for the possible reduced criminal prosecution and sentencing benefits provided under the law by, among other requirements, offering *versiones libres*, or voluntary depositions, during which the applicant was granted the opportunity to freely confess his or her crimes and/or defend against criminal accusations.    These depositions were taken in two parts.    In the first, the applicant had to provide the details of all crimes, identify all illegally gained property and contraband, and identify what happened to their victims. In the second, the applicant was questioned by a prosecutor and publicly confronted by the victims of his or her crimes.

According to a letter dated November 13, 2014, from Giovanni Alvarez-Santoyo, the lead prosecutor in the Prosecutor General's Justice and Peace Unit, the defendant provided voluntary statements on 116 days between December 19, 2006, and November 7, 2014.[20]

---

[20]   A copy of the letter from Colombian prosecutor Giovanni Alvarez-Santoyo, dated November

According to Alvarez-Santoyo, Mancuso's voluntary statements concerned his involvement in and knowledge of a litany of crimes perpetrated by Mancuso and the AUC, including but not limited to "forced displacement, forced disappearance, illegal recruitment of children, gender based crimes, and high profile acts."   *Letter* from Alvarez-Santoyo, dated November 13, 2014, page 1.   For example, Mancuso provided information about and/or accepted command responsibility for "forced disappearances committed by members of the blocs that comprised the organization he commanded."   *Id.* at page 5.   Although no exhumations were performed based on information from Mancuso, 223 bodies had been located and recovered based on information supplied by other AUC members, of which 154 had been reliably identified.   *Id.*   Mancuso also accepted responsibility for what were termed "high profile acts," meaning certain aggravated offenses, including massacres that occurred in 1997 and 2000, the murder and disappearance of students from the University de Cordoba, the murder and attempted murder of trade unionists, and the murders of two special prosecutors of the city of Cucuta.   *Id.* at page 15.[21]

As part of his obligations under the Justice and Peace process, Mancuso was required to surrender his illicit assets and help do the same for others in the control of the AUC.   Moreover, if necessary, he was also obligated to provide and forfeit his licit assets to cover his financial and reparation obligations.   The defendant did apparently surrender some assets and helped to return others seized or stolen by the AUC.   The list of assets surrendered by Mancuso or that he provided information about in the control of other AUC members is extensive, covering 10 pages in the letter from the Justice and Peace prosecutor.   The property included land holdings, homes,

---

13, 2014, translated into English, will be filed with the court separately.
[21]  It was reported that during one Justice and Peace interview, the defendant, using a power point presentation on his laptop computer, recited the names of 336 victims that he had personally ordered to be killed or kidnapped.   *Semana,* 01/16/2007.

and vehicles.   The volume, while striking in size and scope is impressive; but certainly not surprising given the years of the AUC's displacement of thousands of individuals from their lands, the armed and violent control over numerous strategic sectors of Colombia, and the massive volume of drugs trafficked by the AUC to the United States and around the world.[22]

As part of his participation in the Justice and Peace program, Mancuso provided information about the manner in which the AUC raised money to support its military activities and its costs of governing the areas of Colombia it controlled.   The defendant acknowledged that in addition to drug trafficking and taxing those involved in the drug trade, the AUC also used violence and other methods to extort ranchers, farmers, and merchants in return for maintaining security; stole livestock and motor vehicles; appropriated and resold stolen consumer goods such as cigarettes, liquor, and appliances; heavily taxed any legitimate business activity in the areas controlled by the AUC; and diverted and sold fuel from pipelines.   In addition, he described a scheme where rings of attorneys would charge excessive sums for legal services with the attorneys then making contributions back to the AUC.   *Id.* at pages 16-17.

Further, as part of his participation in the Justice and Peace process, the defendant acknowledged extensive corrupt ties to governors, public officials, town councilmen, mayors, court officers, members of law enforcement, and one presidential candidate.   He was apparently forthcoming, at least in some instances and to some degree, about at least some of the harm caused by his own hands, by the harms arising from his leadership of the AUC, and by the harms caused by those under his command.   Mancuso's testimony in the Justice and Peace process was widely

---

[22] Colombian prosecutors acquired millions of dollars of assets attributable to Mancuso <u>after</u> he was extradited to the United States.   It remains unclear whether the defendant has turned over to authorities all narcotics trafficking-related assets.

reported in the news throughout Colombia.

Mancuso was charged in Colombia with criminal offenses which occurred while he was associated with the AUC.    Some of these allegations involved the defendant's own personal misconduct; for other allegations, the defendant was charged with being complicit in the misconduct of others.    These charges were prosecuted in criminal courts in Colombia with jurisdiction to apply the Justice and Peace law. These criminal courts had to decide first if Mancuso was responsible for the crimes alleged, and second, whether he had complied with the requirements of the Justice and Peace law.    The Justice and Peace law provided that eligible defendants would be sentenced to no more than eight (8) years confinement, even though the applicable imprisonment could be substantially greater. In October and November 2014, two criminal courts in Colombia issued lengthy opinions resolving some (but not all) of the defendant's criminal cases in Colombia. In those two reported opinions, Mancuso was found responsible for the deaths of more than 1,000 people, as well as being found responsible for many other serious crimes, including kidnapping, torture, and forced disappearance.[23]    In the two reported opinions, the judges sentenced Mancuso to more than 400 months confinement for the crimes for which he was found responsible, but because the defendant complied with the requirements of the Justice and Peace law, as to those specific criminal allegations, and was eligible for the reduced sentencing benefits in that law as to those specific crimes, the two courts sentenced Mancuso to concurrent eight (8) year sentences.[24]

---

[23]  In November 2014, a court in Colombia found Mancuso to be responsible for displacing more than 6,000 people, though a Justice and Peace data base places the number at more than 10,000.
[24]  Per Colombia law and practice, defendant was tried in absentia and is pending sentencing in Colombia for other criminal cases.    It is not clear whether he will receive the benefits of reduced sentencing under the Justice and Peace program provisions in all of those cases.    Also, Mancuso

It is unclear what Mancuso's motivations were for participating in the Justice and Peace process.   It could be that he was motivated, in part by a desire to bring about some reconciliation and unity after the surrender and partial demobilization of the AUC.[25]   However, it could be equally true that he was motivated by a desire to limit his extensive sentencing exposure for the hundreds of violent crimes with which he was charged in Colombia.

### B. Colombian Supreme Court

Unlike the United States Supreme Court, the Supreme Court of Colombia has the authority to investigate and criminally punish some acts of public corruption.   After the AUC began to demobilize, the Supreme Court of Colombia began to investigate the AUC's ties to numerous national and state elected officials, in what has become widely known as the "Para-Political Scandal" in Colombia.[26]

The defendant has cooperated with the Supreme Court investigations of the corrupt ties between the AUC and elected national figures in the Colombian legislature and among Colombian governors.   The defendant provided information about several elected officials who were

---

has been sentenced in Colombia to prison terms, ranging between 20 and 40 years, in at least five other cases.   Again, it is not clear whether: 1) those sentences will be reduced by virtue of the defendant's participation in the Justice and Peace program, and 2) any sentence remaining for the defendant to serve in Colombia will be deemed to have run concurrent to prison time the defendant has already served in the United States.

[25] Thousands of AUC soldiers did not demobilize and continued to violate the law as members of other criminal gangs in Colombia, collectively known as the BACRIM [drug trafficking organizations post-2006 were no longer considered paramilitary groups, but rather, "criminal bands" (for the Spanish "bandas criminales" – BACRIM); all but one of the BACRIM had their roots in the AUC].

[26] "The AUC maintained close relationships with politicians and the armed forces, as became evident during the unfolding of the "parapolitics" scandal during which more than a third of public officials were investigated for their ties to the paramilitaries.   See: http://colombiareports.co/understanding-colombian-conflict-drugs, 1/14/2015.

allegedly linked to the AUC, including officials who were elected with AUC assistance, and

corruptly accepted financial contributions or bribes from the AUC.    The defendant provided

corroborating information that these elected officials, once in office, promoted the illegal aims of

the AUC and often provided financial kickbacks to AUC commanders, including the defendant.

The government is aware that many other cooperators and witnesses, in addition to the

defendant, provided information which also assisted the Supreme Court investigations of several

prominent Colombian officials who were convicted of crimes.    There are other cases still

pending.    Noted below are some of the individuals investigated and convicted by the Supreme

Court based on a larger body of evidence to which the defendant contributed.    None of the

following were convicted based solely on information provided by the defendant:

- Senator Alvaro Garcia Romero was prosecuted before the Supreme Court of Colombia, and, on February 23, 2010, he was found guilty of corrupt activities and sentenced to 40 years in prison.    In this case, the court's written opinion indicates that Mancuso's information played a significant role in securing Senator Garcia's conviction.

- Senator Mario Uribe Escobar de Jesus, former Colombian President Uribe's cousin, was prosecuted before the Supreme Court of Colombia, and, on February 21, 2011, he was convicted of corrupt activities and sentenced to 90 months in prison.    According to the court's written opinion, Congresswoman Eleanora Pineda provided the most convincing evidence.

- Congressman William Alfonso Montes Medina was prosecuted before the Supreme Court of Colombia, and, on June 20, 2012, Congressman Montes was convicted of promoting illegal armed groups and sentenced to 90 months in prison.    Montes was one of several legislators who attended a secret summit meeting with Mancuso and other AUC leaders in 2001 in the town of Santa Fe de Ralito, in the state (department) of Cordoba.    At the end of this summit meeting, the participants, including Mancuso and Montes, signed a document in which the signers agreed to promote the illegal objectives of the AUC and the political status of the AUC, considered an illegal armed group under Colombian law at the time.    Mancuso provided this document to Colombian investigators.

- Senators Carlos Reinaldo-Higuera and Carlos Galvis-Anaya were prosecuted

before the Supreme Court of Colombia, and, on June 15, 2011, the two were convicted and sentenced to 60 months and 67 months in prison, respectively. The testimony of several witnesses, including Mancuso, revealed that in 2001 several AUC commanders, including Mancuso, handpicked candidates to the Colombian Congress and other state and local positions.   In exchange, these candidates agreed to promote the AUC's interests at the national and local level. The court's opinion also noted that five other congressmen were also convicted of supporting the AUC after being handpicked to run by the AUC.

- Senator Mario Nader Muskus was prosecuted before the Supreme Court of Colombia, and, on May 31, 2012, he was convicted and sentenced to 90 months in prison.   Nader's case is similar to the Reinaldo and Galvis cases noted above.   Mancuso was one of the 12 witnesses whose information was relied upon by the court in its decision to convict Senator Nader.   The court concluded that the AUC pressured voters to vote for Senator Nader and that money from the AUC to Senator Nader was funneled through a political action committee, known as "Marzico."   The court noted that this was another example of how the AUC infiltrated the political process with handpicked candidates who, once in office, provided financial kickbacks to AUC commanders, such as the defendant.

- Governor Jesus Lopez Gomez, Congressman Jose Imbeth Bermudez, and Congressman Jorge Feris Chadid were convicted, and, on February 8, 2012, they were each sentenced to 90 months in prison.   Again, Mancuso was one of several witnesses who provided evidence against the defendants.   Governor Lopez Gomez was the governor of the state (department) of Cordoba, which was controlled by Mancuso's bloc of the AUC.

- Governor and former Congressman Eric Morris Taboada was prosecuted before the Supreme Court of Colombia, and, on December 19, 2008, he was convicted and sentenced to 72 months in prison.   Again, Mancuso was one of several witnesses who provided information upon which the court relied to convict Governor Morris Taboada.   Governor Morris Taboada was the governor of the state (department) of Sucre, another area controlled by Mancuso's AUC bloc.

## IV. Sentencing Recommendation

### A. Overview

In the statement of facts, the defendant agreed that he managed the drug trafficking operations of the AUC, a group which has to be considered one of the world's largest and most violent drug trafficking organizations for most of its existence. Mancuso also agreed that from <u>only</u>

one of the regions in the area he controlled, the Cordoba region, an incredible total of 138,000 kilograms of cocaine were produced, and the vast majority of this cocaine was transported to the United States.   In addition, the defendant also acknowledged that the AUC received 70% of its money from taxing other drug traffickers.

The defendant also agreed in the statement of facts that he was involved in the murders of "military targets," mayors, drug traffickers, and peasants, including the massacre of 42 people in the Salado neighborhood of Bolivar.   The statement of facts also noted that AUC troops committed 15 massacres killing a total of 145 people from May 29, 1999 through September 1, 1999, and that AUC troops committed a massacre of 27 people in the Chengue, Sucre region on January 17, 2001.   The defendant's Justice and Peace sentence in Colombia provides that he was responsible for the death and/or disappearance of more than 1,000 people.

The U.S. Probation officer concluded that Mancuso's total offense level was 41 with a criminal history category of I, resulting in a guideline range of 324 to 405 months.   But, according to the terms of plea agreement, the correct guideline range should actually be 360 to life.[27]   For purposes of calculating the government's sentencing recommendation; however, the government will use the guideline range of 324 to 405 months.

The defendant may well be one of the most prolific cocaine traffickers ever prosecuted in a United States District Court.   The defendant acknowledges that, for a time, he was in charge of drug trafficking activities for the AUC, one of the largest drug trafficking organizations the world

---

[27]   The plea agreement called for a one level increase which acknowledged the "extraordinary" drug quantity in this case (paragraph 8).   The presentence report does not reflect this upward departure agreed to by the parties.   If this level were added, the guideline range would be 360 months incarceration to life imprisonment.

has ever seen and a (now former) designated Foreign Terrorist Organization.   Moreover, as set forth in the statement of facts and as supported by the Justice and Peace information provided by the lead Colombian prosecutor, many innocent victims died and were displaced in Colombia as a result, direct or indirect, of the drug trafficking activities of the AUC, which were under the defendant's leadership and control.   Considering the massive amount of cocaine for which the defendant is accountable for, and the almost unfathomable harm to the citizens of the United States caused by the defendant's uncontested criminal conduct, the government concludes that 405 months should be the starting point for assessing a downward departure.

Pursuant to Section 5K1.1, based upon the defendant's substantial assistance in the investigation and prosecution of other persons in the United States who have violated United States law, the United States recommends a downward departure of no more than 35%, from 405 months, the top of the guideline range as currently determined in the pre-sentence report. Further, in considering the factors set out in Section 3553(a), particularly the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence imposed to reflect the seriousness of the offense and provide just punishment and appropriate deterrence, all of which, in this case -- if ever in a case -- the United States respectfully recommends that this court not depart any further from this recommendation.   Accordingly, a sentence of no less than 263 months imprisonment, which takes into account the assistance rendered, would be appropriate.

### B. Section 3553(a) Factors

In assessing the extent of the downward departure, the government's recommendation is based on the assistance provided to the United States in cases connected to the United States, and

on the factors set out in Section 3553(a).    Under Section 3553(a) and per the terms of the plea

agreement, the government understands that the District Court will impose a sentence which

recognizes the history and characteristics of the defendant, presumably including the assistance

rendered to Colombia as part of the Justice and Peace Process and the para-political investigations.

However, an assessment of the 3553(a) factors supports the government's sentencing

recommendation, thus, the District Court should not sentence the defendant to less than the

government's recommendation.

The nature and unique circumstances of the offense, relevant sentencing conduct, and the

history and characteristics of the defendant support the government's sentencing recommendation.

The offense conduct was extremely serious -- the defendant imported tons of cocaine into the

United States.    This massive quantity of cocaine exceeds the threshold amount for an offense

level 38 by many magnitudes.    Similarly, the four-level leadership enhancement, agreed to by the

parties, requires in part that the defendant be a leader of five or more.    Here he commanded a

terrorist and paramilitary organization which numbered in the tens of thousands; he could receive a

two level enhancement for possessing one firearm, yet here he commanded thousands of armed

men, apparently most of whom supported the AUC's trafficking activities.

The defendant's history and characteristics also supports the government's

recommendation. According to the presentence report, the defendant served in the AUC or its

paramilitary predecessor from 1991 to 1995, and from 1997 to 2004.    The defendant rose to the

highest level of authority in the AUC and exercised that authority in a cruel and ruthless manner.

The Court should consider the entirety of the defendant's history and related relevant sentencing

conduct in Colombia, which includes massive drug trafficking and responsibility for

narcotics-related aggravated offenses, such as murder, torture, kidnappings, bribery, extortion, forced displacement and theft of property, to name a few.   The defendant has cooperated with authorities in Colombia, but that cooperation cannot expunge the long history of drug trafficking and violence presided over by the defendant and thousands more under his command and influence.

In addition, by virtue of his cooperation in Colombia, the defendant has placed himself in a position to receive a very substantial sentencing benefit in Colombia – to have his sentencing exposure in Colombia, for his separate Colombia-based Justice and Peace crimes, reduced from a sentence in excess of 400 months confinement to a sentence of no more than eight years confinement.

Assessment of the defendant's sentencing exposure in Colombia is no simple matter, as the defendant has many criminal cases in Colombia and it is far from clear what his ultimate sentence in Colombia will be.   Will the defendant ultimately face only eight years confinement in Colombia, or will he earn the sentencing benefits of the Justice and Peace law only for some but not all of his criminal cases?   And if his ultimate sentence is only eight years, will it run concurrently or consecutively to the time he has already served in the United States?   These are questions that may take years to sort out by the appropriate Colombian authorities.

Further, the sentence should reflect the seriousness of the offense.   In many cases, it might be difficult to assess the seriousness of the offense, but it would be difficult here to find a drug trafficking case more serious than the defendant's case.   The defendant spent years intentionally flooding the United States with cocaine, profiting from the misery of drug users in the United States, then redirected the profits from the United States to Colombia to enrich himself and to

support a conflict which caused untold tragedy to a large part of Colombia and further contributed to destabilizing other countries in the region.

Lastly, but still importantly, his sentence should afford adequate deterrence to criminal conduct.   Though the AUC demobilized and the FARC is negotiating some type of demobilization, it remains true that many criminal groups still operate in Colombia, trafficking cocaine, and heroin, and other drugs to the United States. Some of these criminal groups are still led by and made up of former AUC members. An appropriate sentence will discourage others from aspiring to the drug trafficking level of a Mancuso.

In particular, this case demonstrates the need for a just punishment that also serves to deter others from ever aspiring to become as prolific as were the AUC drug traffickers. This is significant given what else came along with AUC control.   Their massive drug trafficking activities also involved countless other related relevant conduct atrocities and aggravated crimes.   This conduct served as the means and methods of maintaining authority, power, and influence over corrupt officials and over strategic areas over an entire nation in order to cultivate, manufacture, store, transport, and export cocaine for many years.   All of this combined to cause a devastating and long-lasting impact on the entire country of Colombia, one of the United States' closest allies in the region, and across the hemisphere.   Moreover, the AUC's activities directly impacted the United States where many thousands of users and their families were impacted by the massive amounts of cocaine the AUC purposefully sent to the United States for intended consumption, the profits from which then went back to Colombia, in various forms including weapons, to support their illegal FTO aims.

Accordingly, a sentence of no less than 263 months imprisonment, which takes into account all U.S. assistance rendered by the defendant, would be appropriate -- and by no means excessive -- when measured against the magnitudes of Mancuso's crimes, relevant conduct, and other 3553(a) sentencing factors.

## V. Conclusion

For the reasons outlined above, the government believes that, based on the entirety of the record in this case and the factors set forth in Section 3553(a), a sentence of no less than 263 months of imprisonment is a reasonable and appropriate sentence under the unique circumstances present in this case.

Respectfully submitted,
Arthur Wyatt
Chief
Narcotic and Dangerous Drug Section
Criminal Division
United States Department of Justice

_____

By: Paul W. Laymon, Trial Attorney
Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice
paul.laymon@usdoj.gov
202-330-1400

## CERTIFICATE OF SERVICE

A copy of this motion was mailed, via electronic mail, to counsel for defendant, Joaquin Perez, 6780 Coral Way, Miami, Florida, on February 18, 2015.

_____/s/_____
Paul W. Laymon